# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIEFER DERIK OLGER,

        Defendant-Appellant.

UNPUBLISHED
June 27, 2017

No. 331705
Ingham Circuit Court
LC No. 15-000159-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KIEFER DERIK OLGER,

        Defendant-Appellant.

No. 331876
Ingham Circuit Court
LC No. 15-000162-FH

Before: GADOLA, P.J., and JANSEN and SAAD, JJ.

JANSEN, J. (*concurring in part and dissenting in part*).

With respect to Docket No. 331876, I concur in the decision to affirm defendant's conviction. However, with respect to Docket No. 331705, I respectfully dissent. I am not convinced that the prosecution presented sufficient evidence to support defendant's convictions of delivery of heroin or delivery of heroin causing death beyond a reasonable doubt. I would vacate both convictions because there was insufficient evidence to prove that the heroin Singer ingested before his death was delivered by defendant.

In *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970), the United States Supreme Court explicitly held "that the Due Process Clause [of the United States Constitution] protects the accused against a conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." Later, in *Jackson v Virginia*, 443 US 307, 319; 99 S Ct 2781; 61 L Ed 2d 560 (1979), the Supreme Court articulated the standard for determining whether sufficient evidence exists to sustain a criminal conviction: "[T]he relevant question is whether, after viewing the evidence in the light most

-1-

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The sufficient evidence requirement is essential for the protection of a criminal defendant's due process rights. *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992). According to the *Jackson* Court:

> The *Winship* doctrine [requiring proof of guilt beyond a reasonable doubt] requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A 'reasonable doubt,' at a minimum, is one based upon 'reason.' Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt. . . . [*Jackson*, 443 US at 316-317.]

Thus, *Jackson*'s sufficient evidence standard gives "concrete substance" to a criminal defendant's rights under the due process clause by precluding irrational jury verdicts. *Wolfe*, 440 Mich at 514, citing *Jackson*, 443 US at 315. The inquiry does not permit this Court to substitute its judgment for that of a jury. The *Jackson* Court explained that the sufficient evidence

> standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law. [*Jackson*, 443 US at 319.]

"[T]he prosecutor need not negate every reasonable theory consistent with innocence," but is bound to "prove the elements of the crime beyond a reasonable doubt." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). However, a "mere modicum" of evidence cannot, by itself, support a conviction beyond a reasonable doubt. *Jackson*, 443 US at 320. "While the trier of fact may draw reasonable inferences from facts of record, it may not indulge in inferences wholly unsupported by any evidence, based only upon assumption." *People v Petrella*, 424 Mich 221, 275; 380 NW2d 11 (1985). "In determining whether the prosecution has presented sufficient evidence to sustain a conviction, an appellate court . . . must consider not whether there was *any* evidence to support the conviction but whether there was *sufficient* evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *Wolfe*, 440 Mich at 513-514 (emphasis added; quotation marks and citation omitted).

For a conviction of delivery of a controlled substance causing death, the prosecutor must prove, beyond a reasonable doubt, (1) that defendant delivered a controlled substance, other than marijuana, to another person, (2) that the person who defendant delivered the controlled substance to, "or any other person," consumed the controlled substance, and (3) that the controlled substance caused the death of the person who consumed it. MCL 750.317a. In Docket No. 331705, defendant's charges were specific and limited to the delivery of heroin, a schedule 1 controlled substance under MCL 333.7212(1)(b).

The evidence presented at defendant's trial was sufficient to support an inference that Singer's death resulted from ingestion of heroin. Trim testified that he stopped at a gas station after leaving the Whiskey Barrel on the night of September 11, 2013, because "seconds before [Singer] told [Trim] that he had heroin." Singer spent about 10 minutes in the gas station restroom. Thereafter, Trim entered the restroom and observed two empty lottery tickets and a "powdery" substance he thought was heroin. Trim also testified that after he and Singer reached Trim's house about 20 minutes later, Singer returned to his car and came back inside "a lot more messed up." Singer had said he forgot his cell phone in the car, but Trim suspected that Singer returned to his car to "shoot up." After Singer's death, investigators discovered a lottery ticket in Singer's vehicle that tested positive for heroin.[1]

Both the medical examiner and the forensic toxicologist testified that Singer's death was a result of respiratory failure caused by central nervous system depression, a known side effect of heroin and other depressants. The medical examiner otherwise deferred to the opinion of the forensic toxicologist regarding the exact mechanism of Singer's death. The forensic toxicologist confirmed the presence of morphine, a heroin metabolite, in Singer's blood at the time of death. According to the toxicologist, heroin metabolizes into 6-monoacetylmorphine within minutes of ingestion. After another 28 minutes, 6-monoacetylmorphine metabolizes into morphine. After the first 28 minutes, only morphine can be detected in the blood, while 6-monoacetylmorphine may be detected for a longer period of time in the person's urine. The forensic toxicologist noted the presence of 6-monoacetylmorphine in Singer's urine at the time of death, and testified that in his opinion, Singer's death should be attributed to ingestion of heroin. Singer's blood also contained amounts of amphetamines, alprazolam (a depressant), valproic acid (an anticonvulsant), Citalopram (an antidepressant), caffeine, and THC. According to the forensic toxicologist, none of the other substances present in Singer's system was present in a lethal dose, individually or in combination with the others. The forensic toxicologist did not testify as to whether the presence of any of these additional substances in Singer's body contributed to lethality of the heroin. Regardless, for a conviction of delivery of a controlled substance causing death, the prosecution need not prove that the controlled substance was the only cause of death. The prosecution need only prove that the controlled substance was a contributing cause that was a substantial factor in the victim's death. See *People v Bailey*, 451 Mich 657, 676; 549 NW2d 325 (1996) (explaining that, "[i]n assessing criminal liability for some harm, it is not necessary that the party convicted of a crime be the sole cause of that harm, only that he be a contributory cause that was a substantial factor in producing the harm."). The testimony of the forensic toxicologist and the medical examiner was sufficient to support a rational juror's conclusion that Singer's death was caused, in substantial part, by ingestion of heroin.

The issue in this case, however, is whether the heroin Singer ingested before his death was heroin delivered to Singer, or to another person, by defendant. I submit that the evidence supporting defendant's connection to the heroin causing Singer's death is purely speculative.

---

[1] As will be discussed, the lottery ticket discovered in Singer's vehicle was never tested for fingerprints.

Neither the medical examiner nor the forensic toxicologist testified as to how long morphine might remain in a person's blood after ingestion, or how long after the ingestion of heroin a person is still at risk of overdose. Both experts conceded that they could not offer any opinion as to how much heroin Singer ingested, how Singer had ingested the heroin, or how long it had been since Singer ingested the heroin at the time of death. The hole in the scientific testimony is gaping, as the timing in this case is crucial. The prosecutor's theory was that Singer ingested heroin between 1:00 a.m. and 2:00 a.m. The forensic toxicologist confirmed that morphine would be found in an individual's blood seven hours after heroin ingestion:

> [*The Prosecutor*]: Okay. Doctor, taking this report into consideration, and if you were, for example, presented with a scenario in which an individual ingested an amount of heroin some time around 1:00 or 2:00 a.m. in the morning, and there were facts in evidence that indicated that over a period of hours that individual who ingested that substance was breathing, but the breathing was labored, up until the point of approximately 10:00 a.m., 9:00, 10:00 a.m. that morning, so a period of approximately seven hours, and then later pronounced dead some time around late -- around 11:00 a.m., would blood in the -- the amount we see be consistent with that timeline[?]

> [*Forensic Toxicologist*]: It is.

However, the toxicologist's testimony proves only that if Singer did ingest heroin around 1:00 a.m. or 2:00 a.m. on September 12, 2013, morphine would be present in his blood at 10:00 a.m.

In its totality, the scientific evidence establishes only that Singer ingested heroin more than 28 minutes before his death, which occurred between 9:00 a.m. and 10:30 a.m. on September 12, 2013. The prosecutor's theory is that Singer or one of Singer's companions obtained the heroin that caused Singer's death from defendant between 8:00 p.m. and 9:00 p.m. on September 11, 2013. According to the timeline established by the witness testimony, Singer's purported ingestion of heroin at the gas station and a half an hour later at Trim's house occurred between midnight and 1:00 a.m. on September 12, 2013. Trim was with Singer for the rest of the night, placing telephone calls between 2:00 a.m. and 3:00 a.m. to defendant when he suspected Singer might be overdosing. He did not witness Singer ingesting any heroin. Trim sent Singer's girlfriend, Lindsey O'Leary, a text message at 2:56 a.m. informing her that Singer was "a lot better." Connelly arrived at Trim's house after Trim and Singer, sometime around 4:30 a.m. or 5:00 a.m. Connelly said that when he fell asleep between 5:00 a.m. and 6:00 a.m., Singer was breathing "fine." Trim left the house "very early" that morning to attend a drug test and a class. According to the evidence, Singer died while Trim was in class or shortly after Trim returned from class, between 9:00 a.m. and 10:30 a.m. At trial, Trim testified that after Singer's death, he observed a syringe in his bedroom that had not been there when he left for class. It is therefore impossible to determine whether Singer's death resulted from his ingestion of heroin at the gas station earlier in the evening, about nine hours before his death, in Singer's car about half of an hour later, or from a possible subsequent ingestion during Trim's absence on the morning of September 12, 2013. No expert testimony was elicited or offered to establish the likelihood of heroin overdose nine hours after ingestion. The prosecutor's theory of the case was therefore not supported by the evidence or any reasonable inference based on evidence.

-4-

No direct evidence linked defendant to the heroin Singer ingested before his death. The lottery ticket discovered in Singer's vehicle was not fingerprinted, and neither an eye-dropper[2] discovered in Singer's vehicle nor the syringe Trim discovered in his bedroom were fingerprinted or tested for heroin. It is undisputed that Singer and his companions visited defendant's home less than 14 hours before Singer's death to purchase ecstasy, or "molly." However, there was no evidence that defendant had any heroin in his home that day, and no one testified that they saw Singer purchase heroin from defendant on that day or any other. Singer was with Trim and Connelly, along with a number of other individuals, for the rest of the night, and not one of Singer's companions testified that they saw him with any heroin on September 11, 2013. The evidence allegedly connecting defendant to Singer's death was entirely circumstantial, and consisted of (1) Lo's statement that defendant told Lo he sold heroin and other narcotics to a "group of kids from the Dewitt area," on the day before Singer's death, (2) testimony that Singer and several of his friends had been to defendant's home to purchase "molly" and mushrooms on the day before Singer's death, (3) testimony establishing, in the majority's words, that "the heroin Singer consumed before his death was packaged similar to heroin defendant delivered on other occasions," (4) cell phone records indicating that Trim called defendant numerous times during the hours before Singer's death to "ask what to do," (5) cell phone records and text messages from defendant to Trim and Connelly after Singer's death, and (6) the fact that there was no evidence that Singer obtained heroin from another source. Even when viewed in a light most favorable to the prosecution, I am not convinced that the evidence proved defendant's guilt beyond a reasonable doubt.

To support its finding of sufficient evidence, the majority relies substantially on the testimony of Ingham County Sheriff's Deputy William Lo. At trial, Lo's testimony was offered in support of a charge of delivery of less than 50 grams of heroin, arising from a transaction occurring on November 12, 2013, more than two months after Singer's death. On that day, Lo was working as an undercover narcotics investigator and approached defendant's home "looking to buy some—some heroin." According to Lo, defendant did not have any heroin, but offered to set Lo up with another individual. Lo claimed that as he and defendant traveled to the "meet location," defendant "started talking about this individual he knew," named John, "that had OD'd on heroin." Lo admitted that, at the time, he was familiar with the circumstances surrounding Singer's death. However, he insisted that defendant volunteered information regarding the incident without prompting. Lo's brief account of the conversation proceeded as follows:

> [*The Prosecutor*]: And if you can describe for the jury what he said, please?
>
> [*Detective Lo*]: Yes, sir. He started talking about this individual he knew. He named him as John. No last names or anything like that. Just gave the name of John that he knew that had OD'd on heroin.

---

[2] The eye dropper was collected because, according to Officer Chad Vorce: "At the time that I took that, I believe that the Visine can also hold heroin. They've been known to use it and they squirt is [sic] in their mouth to get high."

*The Prosecutor*: Okay.

*Detective Lo*: He talked about actually [defendant] was telling me about how hard it was to OD on heroin and things of that nature, and he kind of drifted back saying -- talking about how he knew John and everything else and how he dealt with John that evening that John actually OD'd.

*The Prosecutor*: Okay. Now, in this conversation, did the Defendant indicate to you that he had previous dealings with John?

*Detective Lo*: Yes, sir.

*The Prosecutor*: And did -- other than John, did the Defendant name anybody else associated with John?

*Detective Lo*: Yes, sir.

*The Prosecutor*: He named --

*Detective Lo*: He gave another name of Jesse that he dealt with that night.

*The Prosecutor*: Okay. Did the Defendant indicate whether or not he would deal with John and Jesse individually or as a group or something else?

*Detective Lo*: No -- he said that -- specifically that night that John OD'd, he said that he dealt with John and Jesse as part of a group of kids from the DeWitt area.

*The Prosecutor*: Okay.

*Detective Lo*: He did say he did not deal specifically with John. He -- he actually said on a couple different occasions, I didn't deal with John specifically, and he brought it to a point specifically saying, I did not deal with John specifically that night.

*The Prosecutor*: Okay. But as it relates to dealing with the group on the night that John died, did the Defendant tell you what -- what specifically he did to -- did with the group?

*Detective Lo*: Yes, sir. He sold -- that he had sold them heroin and some other -- other narcotics.

Lo testified that he had purchased heroin from defendant on one prior occasion, but the two men were not companions. It seems unlikely that defendant would volunteer, unprompted, sensitive information to a near total stranger during a 20-minute interaction. It also seems unlikely that Lo, aware of the circumstances surrounding Singer's death, did not encourage the exchange of information. Notably, neither Trim nor Connelly, two of the "kids" accompanying Singer to defendant's house on September 11, 2013, testified that they had seen defendant with

-6-

any heroin that day. I can conceive of no reason for Trim and Connelly to lie about their dealings with defendant. Indeed, both Trim and Connelly readily admitted that they purchased "other narcotics" from defendant during their visit, and aside from the mention of heroin, Lo's testimony was otherwise cumulative.

I also question whether Lo's highly prejudicial hearsay account of defendant's statements would have been considered admissible at trial to prove the charge of delivery of heroin causing death, had defense counsel not agreed to consolidate the trial of charges arising from two unrelated incidents. However, credibility determinations are reserved for the jury, and I agree with the majority's conclusion that, when coupled with testimony from Trim and Connelly explaining that they and Singer visited defendant's home on September 11, 2013, Lo's testimony supports the inference that defendant sold heroin to "another person" in Singer's "group" on that day. However, Lo's testimony is certainly not enough to support, beyond a reasonable doubt, an inference that the heroin defendant sold to a member of Singer's "group" was the heroin that Singer later ingested.

There is simply no evidence that Trim or Connelly—who both testified that they purchased "molly" from defendant but denied purchasing heroin—sold, transferred, or shared heroin with Singer on September 11, 2013. Despite the majority's assertion to the contrary, the fact that Trim, Connelly, and Singer went to defendant's house to purchase other narcotics does not support the inference that defendant sold them heroin. Neither does the fact that defendant and Singer shook hands as Singer left defendant's home. Trim did answer affirmatively when asked if he saw Singer and defendant "shake hands in any way" during their meetup on September 11, 2013. However, when asked whether he observed "any sort of hand-to-hand exchange between the Defendant and [Singer]," Trim answered in the negative. While the jury is certainly "free to believe or disbelieve" any of the evidence presented, it is not free to speculate or draw inferences unsupported by the evidence. And while the prosecution is not required to rule out every possible innocent explanation, it is required to affirmatively prove each element of a charged crime *beyond a reasonable doubt*. The jump from innocent handshake to delivery of the heroin that caused Singer's death requires a number of overlapping inferences— that defendant had heroin that day, that Singer requested and paid for heroin, that heroin was small enough or packaged in a way that it could be transferred, undetected, via a handshake, that defendant would transfer the heroin via handshake rather than handing it to Singer when, as Trim testified, the two spoke privately in another room—that involve pure speculation and are simply not supported by the evidence. When we review claims of insufficient evidence on appeal, we are required to draw all inferences in favor of the prosecution. But the standard refers to reasonable inferences, supported by the evidence and properly considered by the jury. When there is no evidence to support an inference, there is nothing to view in a light most favorable to the prosecution. We are not required to speculate in order to affirm a jury conviction. Again, we "must consider not whether there was *any* evidence to support the conviction but whether there was *sufficient* evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt." *Wolfe*, 440 Mich at 513-514 (emphasis added).

The majority suggests that the jury could reasonably infer that defendant provided Singer with the heroin that caused his death because "the heroin Singer consumed before his death was packaged similarly to the heroin defendant delivered on other occasions." This conclusion, like so much of the evidence cited by the majority, is based solely on speculation and unsupported

inferences.  As I have previously noted, it is impossible, on the evidence presented, to determine when or how Singer ingested the heroin that ultimately resulted in his death.  It is therefore impossible to determine its form or its packaging.  No one saw Singer with a lottery ticket, containing heroin or otherwise, on September 11, 2013, or September 12, 2013.  Even the lottery tickets discussed at trial could not be conclusively tied to Singer's consumption of heroin on these dates.  Trim testified that he entered the gas station restroom after Singer and observed two lottery tickets[3] and a "powdery" substance.  These tickets were never recovered or tested for heroin.  The single lottery ticket discovered in Singer's vehicle after Singer's death tested positive for heroin.  However, the lottery ticket was never fingerprinted, and there is no evidence of how long the ticket was in Singer's vehicle before its discovery.  At least two other individuals had been in Singer's vehicle just in the four hours that evening between Singer's visit with defendant and Singer's arrival at Trim's house.

Of course, Trim's testimony regarding the observed lottery tickets, along with the heroin-positive lottery ticket discovered in Singer's vehicle, lend some support for the inference that Singer consumed heroin that was packaged in lottery tickets on September 11, and September 12, 2013.  Additionally, Trim testified that he had known defendant to package heroin in lottery tickets before the September 11, 2013 incident.  This connection might be strong if lottery ticket packaging was unique to defendant.  But it is well known that dealers frequently package heroin in folded lottery tickets.  Indeed, Bruce Ferguson, the Chief of Police for the city of Dewitt, testified that "we know based on information that heroin or other drugs are typically packed in— in a lottery bet slip."  And while the majority relies on the fact that defendant handed Lo a folded lottery ticket containing heroin during the November controlled buy as proof that defendant packages heroin in lottery tickets, I would point out that the heroin defendant obtained for Lo was *from another source*.  This fact weakens even further the proposed exclusive connection between defendant and lottery-ticket packaged heroin.

The majority also suggests that Trim's calls to defendant between 2:00 a.m. and 3:00 a.m. on September 12, 2013, support the inference that defendant was the source of the heroin.  But this inference is not supported by the evidence.  Trim called defendant, one of "a few different people" he called that night, when he thought Singer might be overdosing.  When asked why he called defendant, Trim responded: "I am guessing it was to ask what to do."  The content of their conversation is not known.  To assume that Trim reached out to defendant because defendant was the person who provided Singer with the heroin is to speculate far beyond the bounds reasonableness.  Indeed, Trim testified that he did not see defendant with any heroin that day, and that he did not have any knowledge of the source of the heroin Singer ingested.  It is not, however, unreasonable to infer that Trim called defendant because defendant was his friend and a known dealer, and Trim had seen defendant earlier that day.  In fact, Singer's best friend, Mitchell Pollie, testified that he also received a number of incoming calls and text messages from Trim during the early hours of September 12, 2013.  Trim also called Pollie when he noticed Singer had stopped breathing, shortly before 10:30 a.m. that day.  Likewise, defendant's

---

[3] It is worth noting that during his police interview on September 12, 2013, Trim told the officers he found a "piece of paper," rather than lottery tickets, in the gas station restroom.

expression of interest and concern after Singer's death, especially in light of Trim's decision to directly involve defendant in the incident, does not support the "reasonable inference" that he was guilty of a crime.

In reaching its conclusion, the majority also reasons that "there was no evidence to suggest that Singer consumed heroin procured from different 'sources' in the events leading up to his death." This suggestion is both factually inaccurate and legally inappropriate. First, there was evidence that Singer procured heroin from a source other than defendant. Pollie testified that he sometimes received heroin from Singer, and that during an earlier interview, he had told the police that Singer purchased his heroin from someone named "Jamo" who worked with Singer at a smoke shop. Similarly, although he changed his story at trial, Trim admitted that he told police officers in an interview shortly after Singer's death that he thought Singer had received the heroin from Jamo. Trim testified that during that same interview, he told the police officers that Singer had left his house on September 11, 2013 to "go to Jamo's to get Xanax." O'Leary also told the police that she thought Jamo had been Singer's heroin source, although when she was interviewed, she admitted that this was "just a guess."

Moreover, there is no evidence, either direct or circumstantial, to establish that Singer *did not* possess the heroin before he accompanied his friends to defendant's home around 8:00 p.m. on September 11, 2013. To the contrary, the evidence supports the inference that Singer had access to a cornucopia of illicit substances. In addition to morphine, a heroin derivative, Singer's blood at time of death contained amphetamines, alprazolam, valproic acid, Citalopram, caffeine, and THC. During a search of Singer's vehicle, officers uncovered heroin residue, marijuana residue, a number of pills, including alprazolam and Tenazepam, and a package of syringes. There is no evidence to suggest that defendant was the source of any of the drugs or paraphernalia in Singer's vehicle or in his blood. Singer also had multiple opportunities on September 11, 2013, to obtain heroin from another source. Most notably, Singer was at a bar with his "group" for more than two hours between the time that they were at defendant's house and the time Singer and Trim returned to Trim's home. While it is possible to assume that Singer had only recently acquired the heroin he waited to consume until after he left the bar, it is equally possible to assume that Singer's vehicle had contained the heroin before Singer visited defendant's house earlier that evening. It was Singer's vehicle Trim was driving when the two men stopped at the gas station where Trim assumed Singer had consumed heroin. According to Trim, Singer also returned to his vehicle to "shoot up" after arriving at Trim's house. And it was from Singer's vehicle that the only physical evidence of heroin was discovered, on a piece of a lottery ticket. It was also Singer's vehicle that Singer, Trim, and Connelly took to visit defendant's home that day. And although Singer had passengers in his vehicle from that point forward, none of them testified to seeing Singer stow heroin in his vehicle.

Although I agree that the prosecutor was not required to negate every reasonable theory consistent with defendant's innocence, I cannot agree with the majority's implied suggestion that the prosecution was somehow relieved of affirmatively proving the elements necessary to support a conviction beyond a reasonable doubt. The *lack* of evidence supporting a theory other than the prosecution's does not constitute evidence supporting the prosecution's theory. A criminal defendant is not required to prove anything. To hold otherwise is to improperly shift the burden of proof onto the defendant, who is presumed innocent until the prosecution has proven guilt beyond a reasonable doubt.

I also recognize that the mere existence of alternative inferences, reasonably and logically drawn from the facts presented, is not enough to justify overturning a jury conviction. See *People v Hardiman*, 466 Mich 417, 431; 646 NW2d 158 (2002) (stating that "it is simply not the task of an appellate court to adopt inferences that the jury has spurned"), quoting *Wolfe*, 440 Mich at 514-415. My conclusion rests not on the adoption of alternative reasonable inferences. I mention alternative interpretations simply to illustrate the ease of speculation and the dearth of evidence to support the "inferences" the majority would attribute to the jury in this case. The reality is that no evidence connects defendant to the heroin Singer consumed before his death on September 12, 2013. Defendant's conviction was therefore not based on the available evidence, but on speculation and conjecture. It was the prosecution's burden to prove, beyond a reasonable doubt, that heroin delivered by defendant to Singer or one of Singer's friends caused Singer's death. The prosecution failed to meet that burden here.

For the same reasons, I believe that in Docket No. 331705, the prosecution failed to present sufficient evidence to support defendant's delivery of heroin conviction. Where there is insufficient evidence to support a conviction, principles of double jeopardy dictate that acquittal, not retrial, is the proper remedy. *People v Mitchell*, 301 Mich App 282, 294; 835 NW2d 615 (2013). I would therefore vacate both convictions in Docket No. 331705, and remand defendant's conviction in Docket No. 331876 for resentencing. In light of this decision, I would find it unnecessary to reach the additional issues raised by defendant in his brief on appeal.


/s/ Kathleen Jansen


-10-